**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DAWN KNIGHT, on behalf of
P.K., a minor,

        Plaintiff,

vs.                                   No. CIV 12-382 JB/LFG

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

        Defendant.

**MAGISTRATE JUDGE'S ANALYSIS**
**AND RECOMMENDED DISPOSITION**[1]

    **THIS MATTER** is before the Court on Dawn Knight's ("Knight") Motion to Reverse and Remand for Payments of Benefits, or in the Alternative, for Rehearing [Doc. 19], filed November 15, 2012. [AR 32-33.]  The Commissioner filed a response to Knight's Motion [Doc. 20], and Knight filed a reply [Doc. 21].

    Knight filed an application on April 19, 2007, for Supplemental Security Income ("SSI") on behalf of her daughter, P.K., who was 9 years old then. [AR 147.] This case has been pending for

---

[1]**Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.  *See, e.g.*, Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).**

six years, although some of the delay is attributed to Plaintiff.  Knight claimed disability based on

P.K.'s alleged learning disorder, attention deficit hyperactivity disorder ("ADHD"), behavioral

problems, and hearing loss, with an onset date of P.K.s' birth on April 9, 1998.[2]  [AR 26, 51.]  The

Commissioner of Social Security issued a final decision denying SSI, finding that P.K. was not

disabled from the date of application through the date of the decision on August 19, 2010.

Having considered the pleadings submitted by the parties, the administrative record and the

applicable law, the Court recommends that Knight's motion to reverse or remand be denied.

## I.    PROCEDURAL RECORD

P.K.'s SSI application was denied at the initial and reconsideration levels.  [AR 78, 81.]

Knight filed an untimely written request for review on April 3, 2008, but good cause was established

for the late filing.  [AR 23.]  On June 23, 2010, the ALJ conducted an administrative hearing,[3] at

which time, P.K. had just completed the sixth grade.  [AR 51.]  Knight and P.K. were present at the

hearing, with counsel.  [AR 48.] On August 19, 2010, the ALJ issued a decision finding P.K. not

disabled in accordance with the sequential evaluation used for children under the age of 18.  [AR

20-33.]

---

[2]As noted by the Commissioner, a claimant is not eligible for SSI for any period before the application filing date.  *See* 42 U.S.C. § 1382(c)(7); 20 C.F.R. §§ 416.335, 416.501.  Thus, the relevant time period began when Knight filed the SSI application on April 19, 2007.

[3]On September 9, 2009, a different ALJ began a hearing with Knight and P.K., who were not represented by counsel at the time. [AR 34.] The ALJ noted that there was nothing in the record from P.K.'s school since December 2007, and nothing from any physician since May 2007. [AR 36.] Thus, the ALJ observed that the record was "pretty stale," and gave Knight the option of finding representation and resetting the ALJ hearing.  Knight elected to obtain representation before proceeding. [AR 39.] The ALJ hearing was reset in 2010.

On February 13, 2012, after reviewing additional evidence,[4] the Appeals Council denied

Knight's request for review and upheld the final decision of the ALJ.  [AR 1-4.]  On April 13, 2012,

Knight filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

II.    **STANDARDS FOR DETERMINING DISABILITY FOR CHILDREN UNDER AGE 18**

The Tenth Circuit Court of Appeals described the sequential evaluation used for children

under the age of 18 as follows:

> A child under eighteen years of age is "disabled" if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). A sequential three-step process guides the Commissioner's determination of whether a child meets this criteria. The administrative law judge ("ALJ") must determine, in this order, (1) that the child is not engaged in substantial gainful activity, (2) that the child has an impairment or combination of impairments that is severe, and (3) that the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404.  20 C.F.R. § 416.924(a).

Briggs ex rel. Briggs v. Massanari, 248 F.3d 1235, 1237-38 (10th Cir. 2001).  *See* 20 C.F.R. §

416.926a (functional equivalence for children).

At step 3, the ALJ initially determines whether the impairment meets the requirements of

a listing by satisfying "all of the criteria of that listing, including any relevant criteria in the

introduction . . . ."  20 C.F.R. § 416.925(c)(3). If, however, the child's impairment fails to meet the

---

[4]The Appeals Council noted that it received additional evidence that it made part of the record, consisting of Behavior Health Records from Hogares, Inc., dated June 2, 2010 to August 5, 2010. [AR 4.] While the Hogares individual and family therapy records were not before the ALJ, they became part of the record on which this Court makes its substantial evidence review.  Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006).

criteria, the ALJ determines whether it "medically equal[s] the criteria of a listing." 20 C.F.R. § 416.925(c)(5).

> An impairment is the medical equivalent of a listing "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Medical equivalence can be found where the child has an impairment included in the listings, but "do[es] not exhibit one or more of the findings specified" for the particular listing examined, or "one or more of the findings is not as severe as specified," yet there are "other findings related to [the] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. § 416.926(b)(1)(i)-(ii). Last, if the impairment neither meets nor medically equals any listing, there must be a determination of "whether it results in limitations that *functionally equal* the listings." 20 C.F.R. § 416.926a(a).

Wilson v. Astrue, 2011 WL 824689, *4 (N.D. Okla. Mar. 2, 2011) (emphasis added) (unpublished). In other words, if a child's impairment is functionally equivalent to a listing, the child is disabled.

"For an impairment to be the functional equivalent of a listing, it must be of listing-level severity because it results in either 'marked'[5] limitations in two domains of functioning or an 'extreme'[6] limitation in one domain.  Id. (*citing* 20 C.F.R. § 416.926a(a)).  In assessing whether a child is "functionally limited," the ALJ considers all relevant factors outlined in 20 C.F.R. §§ 416.924a, 416.924b, and 416.929, including: "(1) how well the child initiates and sustains activities, how much extra help [s]he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) how the child is affected by [her] medications or other treatment." Id; Briggs, at 1237-38 (*citing* 42 U.S.C. § 416.926a(a)(1)-(3)).

---

[5]A "marked" limitation in a domain is defined as an impairment that interferes seriously with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).

[6]An "extreme" limitation in a domain is defined as an "impairment(s) [that] interferes very seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). "Extreme" refers to the worst limitations, but "does not necessarily mean a total lack or loss of ability to function." Id.

In addition, the ALJ examines six broad areas or domains in determining if the child functions "appropriately, effectively, and independently" . . . compared with the abilities of other unimpaired children of the same age.  20 C.F.R. § 416.926a(b)(1).

> The six domains are "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Here, the ALJ properly applied the three-step sequential evaluation for children in reaching his decision. [AR 24.] In addition, the ALJ reviewed the definitions of marked and extreme limitations as applied in the context of the three-step evaluation. [AR 25.]

## III.   **STANDARD OF REVIEW**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

5

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's

function is to determine whether the record as a whole contains substantial evidence to support the

Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d

at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what

the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence.  Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must discuss the uncontroverted evidence he
> chooses not to rely upon, as well as the significantly probative
> evidence he rejects.

Clifton, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by

substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "reviewing all of the evidence," [AR 23], the ALJ denied Knight's request for SSI on

behalf of P.K.  The ALJ made the following findings: (1) that P.K. was born on April 9, 1998, and

was a school-age child currently,[7] and on the date of the SSI application; (2) she did not perform

substantial gainful activity; and (3) P.K. had severe impairments consisting of "hearing loss; a

reading disorder, and [ADHD.]" [AR 26.]  The ALJ determined that P.K.'s impairments or

combination of impairments did not meet or medically equal listing requirements, that her hearing

deficits did not fulfill the requirements of § 1.02.08[8] or any adult listing, and that her other

---

[7]Knight argues that the ALJ mistakenly referred to P.K. as a school-aged child in 2010, when she
was 12 years old, and an adolescent for purposes of 20 C.F.R. § 416.926a(g)(2). [Doc. 19, at 4.] The
regulations describe school age children as being 6 to "attainment of age 12," and adolescents to be 12 to
"attainment of age 18." P.K. turned 12 in April 2010.  Thus, she was 12 years old for about 4 months
before the ALJ issued his decision in August 2010, and under the regulatory language probably was
considered an adolescent during that short period.  There was no evidence of medical treatment or
opinions after August 2010.  To the extent there was error in not considering P.K. as an adolescent during
that four-month period in 2010, the Court finds any error was harmless.

[8]This may be a typographical error or intended to refer to § 102.00B2f.

impairments did not result in at least two of the appropriate age-group criteria in paragraph B2 of §112.02.  The ALJ further concluded that P.K. did not have an impairment of combination of impairments that functionally equaled the listings. [AR 26.]

The ALJ's decision discusses the degree of limitation as to each of the six functional domains, along with P.K.'s symptoms and records. [AR 28–32.]  The ALJ also made credibility findings, determining that P.K.'s medically determinable impairments could reasonably be expected to produce the alleged symptoms.  He further found that the statements concerning the intensity, persistence and limiting effects of the symptoms were credible to the extent they were consistent with the finding that P.K. did not have an impairment or combination of impairments that functionally equaled the listings, as explained in more detail. [AR 27.]

Because the ALJ found a marked limitation in only one of the six domains and no severe limitations, the ALJ concluded P.K. was not functionally limited, and, therefore, not disabled. [AR 28-32.]

IV.   **MEDICAL HISTORY AND BACKGROUND**

As of 2010, when the ALJ hearing took place, P.K. was one of Knight's six children, whose ages ranged from 1 to 16 (1, 7, 8, 12, 12,[9] and 16). [AR 367.] P.K.'s mother, Dawn, was 37 years old at the time and a single parent. [AR 148, 367.] P.K.'s father was never involved in P.K.'s life. [AR 368.] It appears that the six children had at least three different fathers. [AR 368.] Dawn Knight was unemployed in 2010 and had lost her home.  Knight stated that they were kicked out of the home because P.K. broke a window and punched a hole in the wall of the home. [AR 391.] Knight's

---

[9]It is not clear from the record if P.K., who was 12 in 2010, had a twin since the record notes two 12-year olds in the family then.  Jeff, the other 12-year old, like P.K. apparently was diagnosed with ADHD.

attorney noted that the family lost the home to foreclosure. [AR 239.]  It is not clear if there was a period when the family was homeless or if they were staying with a friend of Dawn's in a small house or apartment.  [AR 388, 391, 392.] By June 2010, the family was moving into a new home. [AR 386.]

Several records indicate that family life for the Knights was stressful and "chaotic." [AR 257, 374 , 390.] One record described the family as appearing to be in a state of "unrelenting crisis." [AR 374.] In 2010, when Hogares contacted the family's primary care doctor to inquire into the family's whereabouts, the physician stated he was discharging the family from his care because they "were too disoriented to give him accurate information so he could effectively treat them." [AR 388.] Neglect and abuse were suspected at this time.

With respect to P.K.'s birth in 1998, records indicate that she was born two weeks early and had a history of an umbilical hernia. [AR 346, 368.] P.K.'s medical records begin in 2006, when she was about 8 years old. [AR 346-47, 353-54, 263.] There is one medical record, dated May 1, 2006, in which the provider documented a note written by P.K., stating that P.K. hated her family a lot. The provider described P.K. as having a pattern of angry, oppositional non-compliant behavior; he or she wanted to rule out "stress depression."  The provider further stated he or she would discuss P.K. with the school counselor and obtain a psychological evaluation through the school. [AR 263.] There are no records documenting a psychological evaluation by the school.

### *2007 Records*

In 2007, P.K.'s primary care physician was Dr. Bloedel-Clark with Lovelace. [AR 260.] P.K. was in 3rd grade at this time.  P.K. or her mother told the provider that P.K. had problems with her teachers and had just had an appointment with her teachers and the principal.  As of this date, P.K.'s

medications were listed as Dexedrine[10] and Guanfacine.[11]  She had trouble remembering to take her medication and often forgot it.  Her mother described P.K. as "too wild to handle" and that P.K. hit whomever was in her way.  According to P.K.'s mother, her school work was "going down" in the last two months, and her behavior was "so-so."  Due to side effects from medications, P.K. was moody at times, and suffered from headaches and stomach aches.  Knight wondered if P.K.'s medications needed to be changed.  At the bottom of the medical record, there is a notation stating "at recent conference teacher putting [P.K.] down, needed to be held back." [AR 260.] P.K. was assessed with ADHD and major problems at school.  One of her medications was increased at this appointment.  She was referred for a hearing test because of possible hearing loss. [AR 261.]

On April 2, 2007, hearing test results are shown.  A previous hearing evaluation noted hearing loss in P.K.'s right ear at age 5.  She had an ear infection when she was 3 by her mother's report.  She was to use a trial hearing aid in the right ear. [AR 259.]

On April 6, 2007, there is a Lovelace note indicating P.K. sat closer to a friend now in class and was participating more.  Her family life was chaotic.  Contrary to a Lovelace record less than a month earlier, this record notes that P.K. rarely forgot her medication and that the medications helped with school, her behavior, and her relationships.  She was doing better on the increased dosage of Dexedrine.  P.K.'s hearing impairments were "significant," and she was referred to a specialist for a trial of hearing aids. [AR 257.] ADHD was the assessment. [AR 258.]

---

[10]Dexadrine or "Dextroamphetamine is a psychostimulant drug approved for the treatment of attention deficit-hyperactivity disorder (ADHD) and narcolepsy."
http://en.wikipedia.org/wiki/Dextroamphetamine (4/10/13).

[11]"Guanfacine (brand name Tenex, and the extended release Intuniv) is a sympatholytic."  "An extended-release formulation of guanfacine (Intuniv) has also been approved by the FDA for the treatment of attention-deficit hyperactivity disorder (ADHD) in people ages 6–17. Its beneficial actions are likely due to its ability to strengthen prefrontal cortical regulation of attention and behavior."
http://en.wikipedia.org/wiki/Guanfacine (4/10/13).

On April 17, 2007, the specialist discussed P.K.'s hearing loss. The right ear was worse and was a longstanding problem. This physician found that P.K. had a good ability to communicate. He intended to obtain an MRI to rule out acoustic neuroma or a tumor. He found no barriers to learning. [AR 273.]

On April 19, 2007, Knight filed P.K.'s application for SSI, alleging a learning disorder, ADHD, behavior problems and hearing loss. [AR 23, 147.] Also on this date, Knight filled out a function report for P.K. Her vision was fine, but she was being fitted with hearing aids. [AR 158, 159.] Knight claimed that P.K. had communication problems and could not correctly convey telephone messages. She had trouble repeating stories she heard or using sentences that included the words "because" and "what if." P.K. had difficulties talking to her family but not to friends. This record indicates P.K.'s ability to progress in learning and her physical abilities were not limited. [AR 163.] But, her impairments affected her behavior with others, and P.K. did not have or make friends. She did not get along with teachers and did not play team sports. [AR 164.] P.K. was not assessed, at this time, with any problems concerning personal care. She had difficulty paying attention, finishing projects, completing homework and chores. [AR 165, 166.]

A disability report, also dated April 19, 2007, indicates P.K. attended Edgewood Elementary School in Moriarity and was not in special education. [AR 171-76.] There is no indication that P.K. was ever held back a grade as was implied by an earlier notation.

On May 14, 2007, a Lovelace medical record noted that P.K. received special classes or tutoring in reading. Her best subject was math. According to this record, P.K. did not have problems with teachers, other students, friends, or her parents. She rarely forgot her medications, and her school work was good as long as she took her medications. [AR 253.] Her mood and ADHD

10

were stable with the present medications.  Physician notes on the record appear to question whether P.K.'s moodiness was caused by early pubertal changes. [AR 254.]

On May 24, 2007, a teacher filled out a questionnaire regarding P.K.'s performance in the six pertinent domains.  At the time, P.K. was in the 3rd grade; this teacher knew P.K. for a year.  The teacher described P.K. as reading at "below grade level," but that her math and written language skills were "at grade level." [AR 180.] With respect to P.K.'s ability to "acquire and use information," the teacher rated P.K. as "3" on a scale of 1-5,[12] in other words, as having an obvious problem.  In this domain, the teacher did not rate P.K. as having severe or very severe problems in many subcategories.  She noted a slight problem in one category and a serious problem in two categories, specifically in understanding oral instructions and vocabulary.  P.K. tended to ask her classmates if she was doing an assignment correctly. [AR 181.]

With respect to the domain of "attending and completing tasks," the teacher found no problems for P.K. in many subcategories and only slight problems in others.  She found an obvious problem (rating 3) in the subcategory of working without distracting self and others.  The teacher commented that P.K. only disturbed others if she was not spoken to directly or if she could not hear all of the directions. [AR 182.]

In the domain of "interacting and relating with others," this teacher mostly found that P.K. had no problems.  There were some subcategories in which she rated P.K. as having slight problems.  But, there were no obvious or serious problems.  The instructor moved P.K. so that she sat very close to the instructional area.  P.K. had permission to work with her groupmates if she did not understand what was said.  The teacher described P.K. as being very quiet and reserved, and

---

[12]The ratings were defined as: (1) no problem; (2) slight problem; (3) obvious problem; (4) serious problem; and (5) very serious problem.

someone who did not usually ask for extra help. [AR 183.] The teacher understood P.K.'s speech and communication.

The teacher found no problems for P.K. in the domain of "moving about and manipulating" objects. [AR 184.] In the domain of "caring for self," the teacher found serious problems with hygiene and physical needs, like dressing. P.K. had obvious problems in cooperating with taking medications, identifying emotional needs, and using appropriate skills. The teacher noted that P.K.'s mother made sure P.K. took her medications. While P.K. looked clean, she had an odor problem and sometimes smelled like she had been ill. When she was sick, she did not let the teacher know she needed to see the nurse. [AR 186.] Her medical conditions were noted as ADHD and daily depression. She was functional in the classroom and did not miss school. [AR 186.]

On May 24, 2007, P.K. had an MRI of her brain for purposes of further evaluating her hearing loss. The MRI was mostly unremarkable except for the hearing loss. The MRI was somewhat difficult to read due to "considerable patient motion" that blurred detail. [AR 272.]

On June 16, 2007, P.K. was seen at First Choice for left ear pain. She was diagnosed with an ear infection. [AR 345.]

On July 23, 2007, Dr. David LaCourt, Ph.D., performed a mental status exam for disability services. P.K.'s issues were noted as a learning disability, ADHD, and hearing loss. She lived with her mother and siblings in Edgewood. At this time, P.K. was the third of five children, and was in the 4th grade. P.K.'s hearing loss was noted, along with her mother's comment that P.K.'s hearing was "pretty much gone" in the one ear. However, the record indicates P.K. did not yet have hearing aids; she was moved to an area in the classroom so that she could hear better. P.K. was not receiving special education or services.

Dr. LaCourt reviewed and summarized the teacher's questionnaire.  P.K. attended this evaluation with her mother and one sibling.  She was clean and dressed appropriately.  Her grooming and hygiene were normal, and she used "normal pace."  She fidgeted once in awhile but could remain seated and "at task."  She was asked about a few items in the room and responded consistently to conversation in a normal tone of voice.  Her attention was within the normal range.  There was no "appreciable amount of variability or scatter of concentration."

Dr. LaCourt noted P.K.'s history of damaging walls, by kicking the holes in with her feet, at home and at day care.  This type of activity had subsided with no recent wall or physical damage to report.  P.K. regained normal composure in about 30 minutes after she was angry.  There was some "return or rumination" of adverse feelings, but this occurred less frequently than in past years.  P.K.'s mother reported P.K. was doing better at school and her behavior was better as well.  She was given consistent and appropriate "structures" and feedback from her teachers.  There were occasional negative interactions between P.K. and her mother at home. [AR 278.]

P.K. was oriented to people, place and time and partially oriented to her general situation.  Her memory and recall were all right.  Dr. LaCourt's clinical impression was that P.K. was about average in intellectual functioning with a somewhat lower fund of general information. [AR 278.]

Dr. LaCourt observed that P.K.'s affect was appropriate.  Her mother reported that P.K. wrote a "self harm" note while at a doctor's appointment recently.  The note came "out of the blue" and no explanation was given.  P.K. initially claimed not to recall the note.  She was not known to have done anything more than write the note.  She had no adverse plans, actions, or injuries.  There was no evidence that P.K. suffered from hallucinations.  The reality testing was adequate for typically encountered situations.  P.K. did not acknowledge either becoming ill or making herself throw up prior to coming to school.  There was no indication of school phobia, and P.K. liked school

most of the time.  Dr. LaCourt found there was a possibility of emesis/stomach upset associated with

P.K. having taken her medications on an empty stomach although she denied it.

P.K. was asked to complete an WRAT3 reading subtest.  Her basic sight word reading (raw

score) reflected 2nd grade level of basic work reading, although she was in the 4th grade.  The

evaluation notes "rule out mood disorder - largely by history."  A reading disorder was assessed.

[AR 279.]

There is a disability services "request for medical advice form," dated August 21, 2007.  The

note states that P.K. did not seem to show behavior problems but had hearing loss. [AR 280.]

In a childhood disability evaluation form, signed by Dr. Jill Blacharsh on August 22, 2007,

the evaluator found a reading disorder and hearing loss.  The impairments were severe but not listing

level or functionally equivalent to a listing. [AR 282.] Dr. Blacharsh found P.K. with "less than

marked" limitations in five of the six domains, and no limitations in her ability to move about and

manipulate objects.

Dr. Blacharsh made the following specific observations with respect to the domains.

Acquiring and using information: P.K. read at the 2nd grade level and had obvious problems

noted in this area by her teacher.  Still, she had less than marked limitations.

Attending and completing tasks: P.K. fidgeted as reported by the CE but could remain in her

chair, at task, and her attention was ok.  According to the teacher, she had either no limitations or

slight limitations in the related categories.  A function report stated she did not complete things.

Interacting and relating with others: There were problems noted between P.K. and her

mother, but none were observed by the CE.  The teacher stated she had no or slight impairments in

this area.  She was described as very quiet.  The function report stated she had no friends and had

trouble making friends or getting along with teachers. [AR 204.]

14

Moving about and manipulating objects: no limitations. [AR 285.]

Caring for self: When P.K. was sick she did not ask to go to the nurse's office.  The function report indicated no problems in this domain. [AR 285.]

Health and physical well-being: A hearing evaluation indicated right ear hearing loss. [AR 285.]

On August 27, 2007, Knight's application for SSI on behalf of P.K. was denied.  The diagnoses on the form were noted as reading disorder and hearing loss.  P.K. was in regular education classes.  Disability services reviewed the records and found she was not disabled and that there were no marked or severe functional limitations. [AR 75-78.]

On November 6, 2007, Knight filled out a disability report for P.K.'s appeal.  There were no changes since the last report. [AR 192.] P.K. had not seen a doctor since the last report. She took Dextroamphet[amine] for ADHD and Guanfacine as a "downer." [AR 193.] Knight wrote that P.K. sometimes "locks up and won't get ready for school I got to get in her face to get her going that sometimes makes her go off." [AR 194.] Knight also reported P.K. was getting more upset and doing things to children at school.  She had problems there and at home.  Knight needed help with P.K.'s ADHD.  "She is a very hard child."  According to Knight, P.K. had a teacher helping her with a behavior program, and P.K. was now in tutoring two times a week before school.  [AR 195.]

On November 28, 2007, a psychiatrist, E.B. Hall, saw P.K.  He appears to have been primarily managing P.K.'s medications, although some of Dr. Hall's records, particularly this first record, contain handwritten notes.  Many of Dr. Hall's notes are difficult to decipher.

The November 28 note by Dr. Hall states ADHD, treated with Tenex, and "BPD" (bipolar disorder?), followed by the name of the medication Dextroamphet[amine].  Dr. Hall wrote mood swings: acts out, temper/fits/ mood shifts quickly, screams, hits holes in house, hard to fall asleep,

loses temper, argues, mood shifts, worrier, sleeps on floor, easily annoyed, angry, restless, has hit a child in face, behavior plan, mostly mad when Dexedrine wears off, scared of dark, headaches, quiet, shy, refuses to open up.  It is not clear who is reporting these problems, but it may be P.K.'s mother.  On the second page, the notes indicate "Mo" presumably for mother – reporting P.K. has migraine headaches and takes Topamax that helps with the migraines. [AR 311.] The note also indicates "Mo conducted interview" and that mother is a poor historian.  "Rages can last up to 30 minutes" "Mo forgets to give meds" "Can strike out at 6 year old brother" "4th grade hearing aid." [AR 311.] The next part of the notes begin with "M.S.-shy, casual;" the next note may say "reluctant to open up," "history of ADHD and mood disorder since childhood.  Neonatal problems - induced. Mood affect - anxious mood can shift.  ADD symptoms present.  Scared of dark - sleeps with boy or brother.  Axis I - mood disorder, ADHD; Axis III: headaches, r/o migraines perhaps (cannot read); Axis IV: ADD; Axis V: 65 (GAF)."  [AR 311.] The third page of this note states "drew a paper saying she [illegible]" "Dark thoughts – not suicidal.  Hearing loss."  The note may say the mother works graveyard and has a new boyfriend. [AR 312.] Dr. Hall prescribed Trileptal, a mood stabilizer. [AR 312.]

It appears that Dr. Hall saw P.K. again on 12/6/07.  Trileptal helped P.K. sleep.  The mood swings continued.  The current medications of Dexedrine and Tenex, perhaps at different dosages, were noted to improve mood. [AR 308.]

On December 11, 2007, Knight filled out a function report for P.K., stating her daughter did not have vision problems but was using hearing aides.  According to Knight, the doctor noted P.K. was learning sign language.  This report states that Knight was not sure if P.K.'s ability to communicate was limited.  P.K. could not correctly convey telephone messages, tell jokes, or explain things.  Knight reported that P.K. would talk with her family for about 2 seconds, but then

16

"gets upset[,]" "same with her friends." [AR 203.] Knight found her daughter's ability to progress in learning was limited, but she checked "yes" on almost all of the boxes indicating P.K. could read capital and small letters, simple words, could read and understood simple sentences, printed some letters, printed name, wrote in longhand, spelled most 3-4 letter words, new days of the week and months, and understood money.  She could not read and understand stories in books or magazines and could not write a simple story, could not add and subtract numbers over 10, and could not tell time. [AR 204.] Knight wrote that when P.K. read a story she did not always understand it. According to her mother, P.K.'s written sentences were not always completed or "spelled write [sic]."  Her teacher told Knight that P.K. "does not have her add/sub down."  "Don't [sic] know how to read the clock right." [AR 204.]

Knight stated in this form that she was not sure if P.K.'s physical abilities were limited. [AR 205.] But, her impairments affected her behavior with others.  P.K. could not make new friends.  She had friends until she became upset and got into fights.  She got along with adults, family, and teachers.  P.K. got along with her mother sometimes, but became upset if she did not get her way. [AR 206.] Knight was not certain if P.K.'s impairments affected her ability to care for herself.  She did not eat, pick up toys, hang up clothes, do what she was told, go to school on time, or accept criticism.  She would pick up toys or clean the house only if paid.  Her mother had to get her bath ready for her.  P.K. would not wash her own hair and did not brush her teeth all of the time.  Her mother has to keep reminding her to do these things.  P.K. got upset and had a difficult time picking out clothes to wear.  P.K. talked about "not being around."  P.K.'s ability to pay attention and stay on task was affected.  She could not keep busy on her own or finish things.  She wanted someone else to do whatever she was asked to do.  P.K. yelled, and put holes in the walls.  She kicked out a

17

window. [AR 208.] Dr. Hall increased her medications and added new ones.  She received tutoring in reading and math before school. [AR 209.]

On December 15, 2007, P.K. saw Dr. Hall. [AR 332.] This note lists P.K.'s medications, again noting that Trileptal helped P.K. sleep.  Dr. Hall noted that the teacher's feedback showed P.K. was ok in school.  He wrote "wait to see improvement."  P.K. was noncompliant with medications. Dr. Hall wrote "negative attention" and something about her medications.

On December 15, 2007, a teacher filled out a questionnaire, to which Dr. Hall may have referred on this same date. [AR 211.] This teacher knew P.K. for 4 months and taught her in all subjects.  P.K. was in 4th grade and her math and written language skills were at the 4th grade level. Her reading level was at a 3rd grade level.

The teacher discussed the six domains.  In "acquiring and using information," P.K. had obvious problems in most categories and several serious problems.  She often needed oral and written directions repeated.  P.K. worked very slowly and needed visual as well as oral prompts. She grasped new concepts, especially in math, more slowly than most students.  Hearing aids over the last few weeks had helped some. [AR 211-12.]

With respect to "attending and completing tasks," most categories were rated as either no or slight problems.  But, P.K. had an obvious problem carrying out multi-step instructions, and a serious problem working at a reasonable pace and finishing on time. [AR 213.] She was extremely quiet and did not ask for help often.  The teacher monitored her work closely.  She took home more homework than most students, but her homework was almost always returned the next day.  The teacher said P.K. was well liked by students, but that the students tended to "mother" her. [AR 213.]

In the domain of "interacting and relating with others," there were mostly no or slight problems.   She  had  obvious  problems  making  and  keeping  friends  and  expressing  anger

18

appropriately. She was supposedly on a "behavior plan," and was removed from recess for "cussing and malicious gossip." [AR 214.] Instead of speaking directly to someone about problems, she talked about the person to others and gathered a group of "supporters" to cause problems for that person. When confronted about this conduct, P.K. stared at the teacher and refused to talk. [AR 214.] The teacher understood most of P.K.'s communications.

There were no limitations in moving about and manipulating objects. [AR 215.] With respect to the domain of caring for herself, nothing was marked. The teacher wrote, however, that she sees a surprising shift of mood over short periods, on a weekly basis. P.K. was happy one moment and in 15 to 20 minutes, was sullen and silent. When asked what was wrong, she said "nothing." [AR 216.]

The teacher believed P.K. used a hearing aid and was on medications for ADHD. The mother implied to the teacher that she was looking for help with P.K.'s mood swings. When she did not take the ADHD medications, P.K. was unorganized and highly distracted. When taking the medications, she handled her day's responsibilities "pretty well." [AR 217.]

### *2008 Records*

In January 2008, P.K.'s application for SSI benefits was denied on reconsideration. [AR 77, 81.] On February 2, 2008, P.K. saw Dr. Hall, who wrote that P.K. was slamming doors. Dr. Hall may have written the word "instability." Parts of the note cannot be deciphered. [AR 332, 2nd half.] The Tenex did not help. After writing Dexedrine and its dosage, Dr. Hall wrote "doing good in school." The assessment was "ADD/ODD." After listing her medications, Dr. Hall wrote "more compliant with meds." [AR 332.]

On March 1, 2008, Dr. Hall listed the medications again, noting that P.K. threw a fit. He wrote "BPII." "Mother harder on them!" [AR 304.]

On April 3, 2008, Knight filled out a disability report for P.K.'s appeal.  The note states she had seen Dr. Hall on 3/15/08 and would see him again on 4/5/08 for therapy and anger management. Knight still combed P.K.'s hair and noted that her daughter was very temperamental.  If P.K. heard people talking, she thought they were talking about her which "set her off."  She had to be reminded to bathe. [AR 222-25.]

On April 3, 2008, Knight apparently made an untimely request for a hearing.  Good cause was found for the late filing. [AR 23.]

On April 5, 2008, Dr. Hall saw P.K.  Her sleep was good; her grades were good.  She was stable but noncompliant with medications.  The note may indicate that when noncompliant with medications, P.K. was "off the wall."  She was hyperactive and impulsive.  After listing her medications, Dr. Hall wrote "behavioral therapy; family." [AR 304.] It appears that Dr. Hall added Zoloft, an anti-depressant, to P.K.'s medications. [AR 330.]

On August 1, 2008, there is a check-in form for Dr. Hall's office.  P.K. had a problem taking pills.  Side effects from medications included no appetite, dry mouth, and stomach aches.  She had to get up at night to urinate.  She had anger problems. [AR 303.]

Dr. Hall's record dated August 1, 2008, is entirely illegible, except for the prescriptions. [AR 301.]

On December 6, 2008, Dr. Hall noted that Abilify[13] was not working.  He also wrote "grades are good!"  "Throws fits in store. Non talking back crying/?/argumentative."  Dr. Hall discontinued Abilify.  He encouraged therapy - family and individual.  "F/U closely." [AR 300.]

### *2009 Records*

On January 12, 2009, P.K. saw Dr. Hall.  It appears that he wrote: "doing well with ADD symptoms" and "grades went down off meds." [AR 298.]

The March 14, 2009 check-in form indicates that P.K. might need to change her medications.  She had excess appetite, problems going to sleep and staying asleep, irritability, anger issues, and headaches.  She had been harming herself.  "Likes making marks on her (illegible).  "Did it and choking herself."  Having problems at school last two weeks. [AR 297.]

On May 19, 2009, the check-in form lists her medications to include Seroquel.  The comment on the record is that "sometimes she still had a fit." [AR 296.] Dr. Hall's progress note on this date lists medications and states something about being off medications and "distracted."  Seroquel again is listed on this form and on a prescription form. [AR 294.]

The next two notes by Dr. Hall include only copies of prescription forms. [AR 293, 295.]

On August 7, 2009, there is a check-in form.  P.K.'s problems are listed as irritability and anger.  It's not clear who fills out the check-in form, but it may be Knight's handwriting.  The check-in form states that P.K. was telling her brother she was going to kill him with a knife.  "She been hurting them.  Yelling at them telling them words has [sic] well."  Dr. Hall's progress note for

---

[13]It is not clear from the records when Abilify was prescribed.  "Abilify (aripiprazole) is an antipsychotic medication. It works by changing the actions of chemicals in the brain.  Abilify is used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression)."  "Abilify is also used to treat irritability and symptoms of aggression, mood swings, temper tantrums, and self-injury related to autistic disorder in children who are at least 6 years old."  http://www.drugs.com/abilify.html (4/12/13).

this date states "threatening bro with knife - not taking meds." Then he lists "anger management not homicidal mostly awakens in the middle of night." Dr. Hall listed the medications but they are difficult to read. [AR 292.] A new drug, Geodon,[14] is noted.

On September 4, 2009, Nichole Burgin, P.K.'s 5th grade teacher, filled out a questionnaire. Burgin had known P.K. for a year. She saw her five days a week in all classes. P.K. read below grade level but was at grade level in math and written language. [AR 231.] Burgin addressed the six domains.

In "acquiring and using information," Burgin rated P.K. as not have any problem in most subcategories and a slight problem expressing ideas in writing and applying problem solving skills in class discussions. [AR 232.]

Attending and completing tasks: Burgin found that P.K. had no or slight problems generally. She had an obvious problem focusing long enough to complete work without distracting others. She had a serious problem with keeping up a reasonable work pace.

Interacting and relating with others: Burgin found P.K. mostly had no or limited problems in this domain. She had an obvious problem expressing anger and using appropriate language. She had no serious problems. [AR 234.] P.K. did well in the classroom, but was very aggressive on the playground and used "bad language" outside the class room. Burgin understood most of what P.K. communicated. [AR 235.]

Moving about and manipulating objects: PK had no problems in this domain.

---

[14]"Geodon (ziprasidone) is an antipsychotic medication. It works by changing the effects of chemicals in the brain. Geodon is used to treat schizophrenia and the manic symptoms of bipolar disorder (manic depression) in adults and children who are at least 10 years old." http://www.drugs.com/search.php?searchterm=Geodon (4/12/13).

Caring for Self:  P.K. wore a hearing aid and took good care to wear it every days.  This teacher did not know about P.K.'s medications. [AR 236.]

On September 9, 2009, P.K. and her mother briefly attended an initial ALJ hearing without representation.  After discussion with the ALJ, Knight elected to find representation before proceeding. [AR 34-39.]

On October 23, 2009, P.K. was seen at First Choice for right ear pain.  She had an ear infection. [AR 343.]

***2010 Records***

In early 2010, Knight obtained counsel. [AR 119.]

On January 16, 2010, P.K. saw Dr. Hall.  The check-in form indicates she was having problems with sleep.  On Dr. Hall's progress note, it states "not going to kill brother" and then something about a sister.  There is a prescription for Seroquel and Lamictal.[15] [AR 317.]

On February 20, 2010, Dr. Hall's check-in form indicates irritability, anger issues, and sad/weepy/unhappy feelings. [AR 315.] Someone, probably Knight, wrote, "need to different or add a med in mornings[,] getting bad about acting like she 2 yr not wanting to get ready for school." [AR 315.]

On Dr. Hall's progress note, he wrote "when bites, draws blood [rest illegible]" He also wrote that Seroquel was not working.  "Very dysfunctional."  Dr. Hall said something about P.K.'s mood.  He discontinued some of the Seroquel.  There is mention of Knight's "little son" "acting up."

_____

[15]"Lamotrigine, marketed in the US and most of Europe as Lamictal [] by GlaxoSmithKline, is an anticonvulsant drug used in the treatment of epilepsy and bipolar disorder. It is also used off-label as an adjunct in treating depression." http://en.wikipedia.org/wiki/Lamotrigine (4/12/13).

Most of the record is indecipherable but it may say "consider Lithium." Dr. Hall wanted to refer P.K. to Hogares. "Needs family therapy." [AR 314.]

On February 24, 2010, P.K. had a hearing test. There was loss of hearing in the right ear, but they did not want to replace the hearing aid. Instead, she was to see how she did in school with preferential seating. [AR 339-340.]

On March 3, 2010, Dr. Hall was asked to fill out a form regarding the six domains of functioning for P.K. [AR 361.] The form is addressed to Dr. Hall and states that as he probably knew, P.K. suffered from ADHD with psychotic features, hearing loss, multiple personality, hallucinations.[16] The requesting party, who may be counsel for Knight, asked Dr. Hall to assess P.K.'s impairments as to her development and performance of age-appropriate activities as compared with children the same age who did not have impairments nor were in special education classes. The definitions of "marked" and "extreme" limitations were provided with the form.

Dr. Hall filled out the 2-page form, consisting only of definitions and boxes to check. There is no space to write any comments or support for the ratings. [AR 361-62.] The domains are defined, as are the terms "marked" and "extreme." Without citations to authority, the sources of definitions are not clear.

With respect to P.K.'s ability for "acquiring and using information," Dr. Hall checked the box "marked" level of impairment. For the domains of "attending and completing tasks," and "interacting and relating with others, he marked "extreme" levels of impairment. Regarding P.K.'s ability to move about and manipulate objects, Dr. Hall marked "none to slight" with respect to impairments. [AR 362.]

---

[16]It is not clear what records, if any, support alleged diagnoses of ADHD "with psychotic features," and "multiple personality," or symptoms of "hallucinations."

For the domains of "caring for yourself" and "health and physical well-being," Dr. Hall found "marked" levels of impairment.  This is the last record provided by Dr. Hall.

On March 4, 2010, counsel submitted additional records to the ALJ, including Dr. Hall's March 3 evaluation. [AR 242.]

On March 24, 2010, P.K. was seen at Hogares for a comprehensive assessment. [AR 365.] The Hogares records were not before the ALJ, but were provided to the Appeals Council, and, therefore, are part of the record.  The Hogares intake form and assessment is lengthy with respect to family history.  P.K. was present for the interview with her mother.  The family was the "sole source" of information provided about P.K. to Hogares. [AR 365.]

P.K.'s mother reported that P.K. needed anger management and had issues hurting people. When P.K. was angry, she liked to punch things, make holes in walls, and break windows.  She picked at her fingernails.  When others spoke, P.K. thought they were talking about her.  P.K. "often talks about killing self."  Her mother found notes stating P.K. wanted to kill herself.  She scratched out her face in pictures.  She would not take medications without supervision.  P.K. had been on a number of different psychotropic medications.  If she did not take the medications, she did not do well.  Her mother has to remind P.K. to bathe and change her clothes.

At this time, they were living with the mother's friends.  P.K.'s mother lost her job last month and the family recently lost their home.  P.K. was fighting at school in the past year and at the beginning of this year. [AR 365.] P.K. would lie down and throw a fit like a two year old; she would scream, stomp, and hit walls.  Medications helped, and P.K.'s mother felt that if she were on the right medication, it would help.  They had been seeing Dr. Hall for the last three years.  She stated that Dr. Hall did not provide therapy, however, just medications.  P.K.'s mother hoped that therapy would work. [AR 365-66.]

P.K.'s mother described various family interactions.  Some of the children got along with each other; some did not.  P.K.'s mother did not feel P.K. could handle the 1 year old baby although P.K. said she felt close to the baby. [AR 367.]

P.K. wanted to play soccer and volleyball in mid-school next year.  She was good at soccer, building things, and writing.  She was on the honor roll in 4th and 5th grades.  P.K. wanted to improve her reading and grades.  She wanted to explore the world.  Her mother said P.K. would help around the house and was very outspoken.  At another point, P.K.'s mother said P.K. did not help much in the house.  P.K. stated she helped in the kitchen and cleaned the living room.  She was supposed to clean her room but did not.  She fed the dogs and cats but often forgot.  [AR 367.] P.K. said she watched television, jumped on the trampoline, and played games with friends.

P.K.'s mother reported that P.K.'s father was never in her life. [AR 368.] Children Youth and Families Department ("CYFD") recently investigated because of complaints about the boys smelling and the oldest daughter driving without a license.  According to the mother, the accusations were unsubstantiated. [AR 368.] P.K.'s mother stated that the baby's father was an alcoholic and abusive toward her.  One of the boy's fathers also was very violent.  According to the mother, there was mental illness in P.K.'s father's family.  Two children had ADHD. [AR 368.]

P.K. had taken Dexadrine since 2009 for ADHD and Seroquel for moods and sleep since about 2009. [AR 370.] She was in 6th grade, regular classes and attending regularly.  Her mother had requested an IEP.  P.K. was strong in math but needed help in reading and spelling.  She made friends easily but had difficulty keeping them. [AR 370.] She fought with some friends often.  P.K. could be rude and hurt friends' feelings. [AR 371.]

P.K.'s mother stated she yelled at the children.  P.K. witnessed her mother being physically abused in the past.  P.K.'s oldest sister used to duct tape the kids to chairs.  P.K. stated she used a

26

knife, broom, and rocks when fighting with her siblings. [AR 372.] She tried to run away several times and often felt nothing would improve and nothing was worth getting out of bed.  She had expressed suicidal ideation in the past and felt depressed daily for two years.  She felt anxious at times for no reason.  She always had abrupt, extreme mood swings. [AR 373.]

P.K. had homicidal ideation and thought about hurting others.  She felt this way a few times a week and all the time at home.  She thought about killing herself once a week although she had no plan.  She had choked herself before.  The interviewer noted that the historical data was inconsistent.

During the mental status exam, P.K.'s appearance and posture were all right; her attitude was cooperative; and her activity was normal.  P.K.'s speech was normal.  Her mood was restricted and thought content unremarkable.  Her thought process was organized; her insight and judgment were fair. [AR 374.] Her memory was all right.  The assessments were adjustment disorder with anxiety, Bipolar II disorder, oppositional defiant disorder, and ADHD.  The GAF then was 57. [AR 374.]

Since her mom lost her job and home, P.K. had felt anxious.  She was doing poorly at school.  P.K. had limited opportunities to socialize with peers and did not participate in recreational activities.  The social worker/interviewer noted the family appeared to be in a state of unrelenting crisis.  P.K. appeared reactive and impulsive in decision-making. [AR 374.] The interviewer believed that P.K.'s problems were due to family history and a genetic link to substance abuse or mental illness, environmental influences, and domestic violence. [AR 374.]

P.K.'s family life appeared chaotic.  The negativity at home affected P.K's mood.  There was much inconsistency that negatively impacted her mood and increased depression.  There was family history of mental illness, including P.K.'s sister and mother.  P.K.'s ADHD appeared to negatively impact her academic performance. [AR 375.] The Hogares interviewer recommended individual and

27

family therapy, a psychological evaluation and parents skills training.  P.K.'s mother was noted to need this type of treatment/training as well. [AR 374.]

On April 23, 2010, Knight's attorney wrote to the ALJ, noting the family lost the home to foreclosure and was now homeless or dependent on friends and neighbors for shelter. [AR 239.]

On May 26, 2010, therapist Jan Marquart with Hogares met with P.K., who was alert, cooperative, and open about anger.  She described two incidents when she acted inappropriately. P.K. was interested in sports, reading, and painting but had no summer activities.  She was emotionally guarded and restrictive.  She seemed to want to give answers that pleased the therapist. Marquart gave P.K. information about the local library's services.  P.K. appeared receptive, but it was unclear to the therapist how she really felt. [AR 385.]

On June 2, 2010, Hogares therapist Ingram worked with P.K.  They discussed the homeless situation.  P.K. thought her family was getting "kicked out" of the house that weekend.  She thought they probably would live in the car.  P.K. was not very communicative, but talked about being upset at people with whom her family was staying.  She was unusually quiet, but did art work in the session.  After the individual session, the social worker asked P.K.'s mother about living in a car. The mother said she was not sure where they would live.  Ingram advised her to go to a homeless shelter if all else failed. [AR 392.]

On June 4, 2010, Ingram met with P.K.'s mother and coached her about the homeless problem.  Her mother reported they were kicked out of the home because P.K. broke a window and punched a hole in the wall (although attorney noted earlier it was due to foreclosure).  The family was currently staying with the mother's friend in Estancia, but Knight did not reveal an address. The family car was not working, and the family had no way to look for housing even though there was an option of the HUD rapid re-housing program that would fund housing.  However, HUD

required she have a 4-bedroom house, and there were no such houses available.  Ingram encouraged P.K.'s mother to find another way to get housing.  The mother was very frustrated, but working hard to change the situation. [AR 391.]

On June 4, 2010, Marquart, with Hogares, met with P.K. and her brother for a long session. There was some discussion of an "incident."  The reason, for example, for the incident was to find out where the family was living because of contradictory information given by the mother, the son Jeff, and P.K.  Jeff and P.K. gave conflicting stories about where they were living and seemed reticent to disclose their whereabouts.  Jeff stated he had a cookie for breakfast and P.K. had chicken soup.  The children were stressed, and P.K. seemed to be lying when asked if she took her medications.  Both children claimed to be writing in their journals and appeared to want to give answers that pleased Marquart.  The therapist tried to contact the mother, but she did not return the call.  Marquart contacted the family's doctor, who stated he was discharging the family because they were too disoriented to give him accurate information so he could effectively treat them. [AR 388.] Marquart consulted with others at Hogares and made follow up calls to "SCI," CYFD, the police, and others.  The mother did not return calls.  Marquart planned to report suspected neglect and abuse, fearing the family had no place to sleep and that five children were sleeping in the car.  The oldest daughter was staying with her boyfriend.

On June 8, 2010, Marquart conducted an individual session with P.K.  She felt both children, Jeff and P.K., were trying to protect their mother.  P.K. stated they moved into a male friend of their mother's place, that he and his two children stayed in one room with the boys, and the girls slept in the second bedroom with the mother.  P.K. had chicken soup for breakfast and no lunch.  She was not certain how long they would stay with the friend.  P.K. claimed to be writing in her journal and stating that she was happy and all was fine.  Outside the session, the therapist asked P.K.'s mother

to get the journal to verify the documentation.  Then, P.K. admitted she did not write in the journal that week.  She claimed to have taken her medication on time every time.  The therapist wrote: "this family is quite chaotic and nothing is on schedule." [AR 390.] P.K. was dressed more appropriately this time.  She was alert but reticent to answer questions honestly.  Her mood was flat, and her answers were designed to please the therapist.  She was unrealistic about her perceptions of their life situation.  P.K. claimed to be happy and that all was fine.  The therapist worked on "constructs of bipolar," and how to assess moods.  She reinforced the request for P.K. to document her emotions, moods, intentions, and behaviors.  Both P.K. and her brother had totally different stories about their lives. [AR 390.]

On June 16, 2010, Marquart met with the family, including the mother, P.K. and Jeff.  P.K. came in looking like a 22 year old going out on a date.  She and her brother were non-participatory and remained quiet while their mother spoke.  The family was moving into their own home that night, and P.K. was to have her own room.  The children continued to search Marquart's face for prompts as to what answers she might want.  P.K. had poor judgment and was not consistent with her medications or following goals.  She denied physical abuse that week but said she yelled at her brothers.  She did not want to get a library card or sign up for sports.  All treatment was on hold until the family moved.  The therapist tried to provide reassurance and reframing about P.K.'s bipolar disorder.  P.K. referred to the diagnosis of bipolar as her disability.  The therapist was concerned about P.K. being stigmatized by her mother as ill. [AR 386.] P.K. responded to the reframing and explanation. She was alert when Marquart told her she could learn ways to manage her behavior and emotions and the medication's purpose was not to make her a different person.  She should take the medication regularly.

On June 23, 2010, the ALJ hearing was conducted.  P.K., her mother, and counsel attended. The ALJ noted that he had P.K.'s mother, her brother, and the attorney at an earlier hearing that day. but that this was a separate hearing. [AR 46-48.] P.K. was asked to leave while the ALJ asked questions of the mother.  P.K. just finished 6th grade a few weeks earlier, and her grade level was appropriate. [AR 51.] She earned Bs, Cs, Ds, and Fs. [AR 52.] She was to get an IED next year to see if she needed special help.  In the past year, P.K. had special help with reading where she was below average.  However, she passed 6th grade. [AR 51-52.]  Her mother testified that P.K. did not understand spelling or the concept of words.

In her free time, P.K. played with a neighborhood friend, although her mother tried to keep her away from friends, as P.K. could be "quite a little diva," become upset, and fight.  She was all right with her younger siblings on a good day, but most of the time was not good and P.K. became very violent. [AR 54.] P.K. had no patience with the 18 month old baby, would shake her and tell her to shut up, and become violent with her.  It did not help to tell P.K. that was wrong.  She became angry if she did not get her way.  She broke a tree branch the other day from hanging on it, and her mother described her as a "ticking bomb." [AR 56.]

According to her mother, Dr. Hall recommended that she put P.K. in a hospital, but the medical records, to the extent they are legible, do not confirm that recommendation. [AR 56.] P.K.'s medications were changed, and her mother thought the increased medications might help with her Bipolar disorder.  After they left the attorney's office the previous week, P.K. kicked, pinched, and hit kids.  [AR 56.] If asked her why she hit others, P.K. said they were in her space.  The mother also was taking medications to help and went to therapy as well. [AR 57.]

P.K. drew at home and decorated her room. [AR 57.] She read but did not watch too much television.  Knight was not sure what P.K. did with the neighbor kid.  They might swing or play with dolls. [AR 59.] P.K. usually "threw a fit" if asked to help around the house. [AR 59.]

Regarding her personal hygiene, Knight had to remind P.K. constantly.  She refused to take a bath.  She selected clothes to wear that did not match.  She would not brush her teeth.  It was embarrassing to take P.K. places because she threw fits and screamed. [AR 61.]

In response to her attorney's questions, Knight stated that she had to remind P.K. to take medications for ADHD and bipolar disorder.  She was resistant in taking her medications and was moody 90% of the time.  She fought with her siblings at home, and hit kids in the back of the car if things annoyed her. [AR 62-63.]

P.K.'s school called Knight probably weekly if not 2-3 times a week due to problems with P.K.  She could not focus or stay on task.  She interrupted during class and argued with other kids. She had no long term friends. [AR 63-64.]

The ALJ then asked P.K. questions. [AR 65.] P.K. stated the family just moved to a new house two weeks earlier and that she had a neighborhood friend with whom she played basketball. P.K. did not have a bicycle but knew how to ride.  She played football with some of the kids on the playground and had fun. She played volleyball too.  According to P.K., she helped around the house. She might not do it right away when asked and did not know why.  She had some troubles with her siblings and got into arguments. [AR 66-69.] She could brush her teeth but needed reminders.  She did not like to do those things.  She did "good" in school.   She did not do well in reading.

P.K. had temper tantrums in the car. [AR 70.] She screamed, hit, and kicked things like windows.  She also had trouble with Jeff, her older brother, and threatened him before.  P.K. had difficulties with the baby at times and her mother reminded her not to get angry with the baby and

not to shake the baby. [AR 70-71.] She had to be reminded to take her medications. The medications helped but had to be changed. She had a temper problem, mostly at school. Bathing was not a problem.

P.K.'s mother stated there were times when P.K. tried to kill herself and times when she went after the other kids at home with a knife. [AR 74.]

On July 3, 2010, P.K. had therapy at Hogares with Ingram. She was instructed how to use creative writing and the art process. The therapist asked how P.K. was doing in the new home and discussed loss of her counselor. P.K. was very bright in mood and cooperative. She loved the art-making process. [AR 383.]

On July 20 and July 23, 2010, P.K. worked with art at therapy sessions. [AR. 381, 382.] On July 27, 2010, P.K. saw Jeannette Freeman at Hogares. She was well groomed and relaxed. She made eye contact and engaged in conversation. She just had an appointment with the psychiatrist at the Torrance Program. Her mother entered the therapy session near the end, without being invited. The therapist talked with P.K. about her interests in music and jewelry. P.K. spent the night with her sister and a sister's friend and did one another's hair. [AR 379.]

On August 5, 2010, P.K. saw Freeman again at Hogares. She was dressed in oversized clothes and was cold. P.K. was engaged in an art project. The therapist attempted to engage P.K. in conversation. P.K. responded but did drawings. She was very tired from having to wake up so early to come to this session. She yawned a lot and had difficulty being alert. Her verbal responses were minimal and limited. P.K. felt hopeless about being in her depressed home. She could not say what would make her happy. Her motivation and energy level were low. The therapist planned to address P.K.'s depression and anger. [AR 378.]

33

On August 19, 2010, the ALJ issued a written decision denying Knight's claim on behalf of P.K. [AR 20-33.] On September 10, 2010, Knight requested review, stating she did not agree with the ALJ's decision. [AR 16.]

The next record, dated February 13, 2012, is the Appeals Council's denial of the request for review. [AR 1-4.]

## V.   DISCUSSION

### A.   Alleged Legal Error

Knight challenges the ALJ's findings regarding five of the six domains, and contends that the ALJ's findings were in error or not supported by substantial evidence.  Knight argues that, contrary to the ALJ's determinations, P.K. has "extreme" impairments in the domains of interacting and relating to others, and caring for herself. [Doc. 19, at 4.] In addition, Knight asserts that P.K. has "marked" impairments in the domains of her ability to acquire information, attending and completing tasks, and health and well-being.

In her argument regarding the ALJ's specific domain findings, Knight asserts that the ALJ "improperly diminished the importance of Dr. Hall's opinion" and that Dr. Hall's findings were consistent with reports by Knight and P.K.'s teachers. [Doc. 19, at 6-7.] She also contends that the ALJ erroneously "minimized the impact of the Hogares records" based on the ALJ's finding that the Hogares assessments did not originate from an "acceptable medical source."[17] [Doc. 19, at 14.]

---

[17]When the ALJ issued his opinion, he only had the benefit of the Hogares intake assessment. The Appeals Council was provided with subsequent Hogares individual therapy records.  The ALJ noted that he had not seen actual therapy records from Hogares although Knight testified that P.K. attended weekly therapy sessions.  The ALJ further found that while he considered the Hogares' provider's diagnoses in the intake assessment, they did not originate from an "acceptable medical source." [Doc. 28.]

Knight also asserts that the ALJ failed to compare P.K. to non-disabled children, failed to consider P.K.'s mother's testimony, and failed to consider the combination of P.K.'s impairments, all of which were error.  Knight requests a remand, or, that the Court enter an Order reversing for payment of benefits. [Doc. 19, at 25-26.]

      B.      <u>Analysis of Domains</u>

            1.      ***<u>Interacting and Relating with Others</u>***

The ALJ discussed this domain in terms of how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others.  [AR 30] (*citing* 20 C.F.R. § 416.926a(i)).  School age children should be able to develop more lasting friendships with children who are the same age.  The child should be able to begin to understand how to work in groups to create projects, should be able to talk to people of all ages, share ideas, tell stories and speak in a manner that is readily understandable. [AR 30.]

The ALJ also set forth examples of limited functioning in this domain that apply to a range of ages.  The ALJ determined that the evidence was consistent that P.K. "sometimes has significant problems interacting with her siblings and classmates.  She is subject [to] anger outbursts, temper tantrums, and use of inappropriate language supporting <u>marked limitation</u>" in this domain. [AR 30.]

Knight argues that the evidence supports an "extreme" limitation in this domain, or in other words, the "worst limitation," although an extreme limitation does not necessarily mean a total lack

or loss of ability to function.[18]  *See* 20 C.F.R. § 416.926a(e)(3)(i) (definitions).  [Doc. 19, at 4-8.]
In support of this position, Knight refers to medical records in 2007, where P.K.'s mother reported
to the doctor that she and P.K. had just met with a teacher and principal about P.K.'s aggressive
behavior.

The Court observes that the medical record in question [AR 260] sets out the typed question,
"Do you have any problems with your relationship with your teachers, other students, friends or
your parents?"   It appears that the mother or staff wrote, "Yes - I just had appt w/her teachers &
principal (about her teacher about [P.K.].)" At the bottom of the record is a handwritten note: "At
recent conference – teacher putting [P.K.] down, needed to be held back."  Behavior on this record
was noted as: "so-so."  The word "aggressive," contrary to counsel's argument, does not appear, and
it is unclear what the exact content of the appointment with teachers and the principal was.  It is true
that Dr. Bloedel increased the dosage of Dexedrine and assessed ADHD, "major probs at school."
[AR 261.]

In Knight's motion, she skips over numerous 2007 records and emphasizes a small part of
a December 2007 teacher questionnaire where the teacher commented that P.K. was removed from
recess for "cussing and malicious gossip." [AR 214.] Knight next jumps to a 2009 teacher
questionnaire, where the teacher wrote that P.K. did very well in the classroom but was very

---

[18]Knight discusses the standards in terms of both school-aged children and adolescents, although
the ALJ did not appear to review the record in terms of P.K.'s "adolescence" for the short time she was 12
before the August 2010 decision.  The differences in regulatory definitions in this domain, between
school-aged children and adolescents, do not appear significant.  As noted *supra*, any error in not
evaluating P.K. as an adolescent was harmless.  Moreover, where the regulatory definitions do differ, the
Court finds little to no evidence of record to support any severe or marked findings in the domains during
the short period P.K. was considered an adolescent.  There are only Hogares' therapy records for a brief
period after P.K. turned 12.  As noted in those therapy records, many of the notations rely on subjective
reports by P.K.'s mother.

aggressive on the playground and used bad or inappropriate language outside the classroom. [AR 234.]

Knight failed to mention that in the 13 subcategories of the "interacting and relating with others" domain, this same teacher rated P.K. as having no problems in 8 subcategories, a slight problem in 3 subcategories, and an obvious problem in the subcategories of expressing anger appropriately and using appropriate language.  No serious or very serious problems were marked. [AR 234.] When asked if it was necessary to implement behavior modification strategies for the child in this domain, the teacher checked off "no."  The teacher further noted, by checking off boxes, that she understood P.K.'s communication almost all of the time.  [AR 235.]

The Court observes that Knight's argument related to isolated portions of the above-described records should be examined in terms of the records she failed to mention.  For example, while P.K. and her mother met with teachers about her behavior in March 2007, by April 2007, a medical record indicated P.K. sat closer to a friend in class and participated more.  She rarely forgot her medications that helped with school, behavior and her relationships.  She had improved with increased medication.  [AR 258.]

Even Knight's disability report for her daughter stated that P.K. did not have problems talking to friends, although she had trouble talking to her family. [AR 163.] Knight stated that P.K.'s impairments affected her behavior with others and that she did not make or have friends, could not get along with teachers, and did not play team sports, as of April 2007. [AR 163, 164.] Yet, at the same time, P.K.'s impairments did not result in her being held back a grade and she was not placed in special education classes.

A May 2007 medical record, in contrast to Knight's reports, stated that P.K. did not have problems with teachers, other students, friends, or her parents. She rarely forgot her medications, and her school work was good as long as she took the medications. [AR 253.]

In May 2007, P.K.'s teacher rated P.K. as mostly having no problems in the domain of interacting and relating with others. She had slight problems in some subcategories, but no obvious, serious, or very serious problems in this domain. [AR 183.]

On July 23, 2007, Dr. LaCourt performed a mental status exam for disability services, at which time Knight reported P.K. was doing better at school and her behavior was better. [AR 278.] Testing indicated a reading disorder. While Dr. LaCourt stated there was a need to rule out a mood disorder, he also noted the reported disorder was "largely by history." [AR 279.]

An evaluation form filled out in August 2007 by Dr. Blacharsh indicated "less than marked limitations in five of six domains and no limitations in P.K.'s ability to move about. Dr. Blacharsh further commented that while P.K. and her mother discussed problems  in the domain of interacting and relating with others, the consultative examiner observed none. The teacher also noted no or slight impairments in the domain. The function report, a subjective report by Knight, indicated problems in this area. [AR 204.]

While the ALJ did not discuss each of the above-described records in the same detail, he stated that he carefully considered the entire record and commented on many of the same records. [AR 26, 28.] He specifically discussed the teacher's questionnaires and medical records from 2007, along with Dr. LaCourt's psychological evaluation and testing results. In addition, he addressed Dr. Hall's opinions, which Knight relies on heavily in support of finding an extreme limitation in this domain. [AR 27-28; Doc. 19, at 6-8.]

As argued by Knight, Dr. Hall, in March 2010, filled out a form regarding the six domains of functioning for P.K, who was still 11 years old at this time. [AR 361.] As noted by the Court *supra*, the form appears to contain unsubstantiated diagnoses that were provided by someone other than Dr. Hall, perhaps by counsel, (that may not have related to P.K.), *e.g.,* Dr. Hall "probably knows" that P.K. suffers from ADHD with psychotic features, multiple personality, hallucinations. [AR 361.] While the record supports a diagnosis of ADHD, the other symptoms or possible diagnoses are not supported.

Dr. Hall checked off boxes, making no further comments and adding no support for his opinions.  But, he found an extreme limitation in the domains of attending and completing tasks and interacting and relating with others. [AR 362.]

Plaintiff argues that notwithstanding P.K.'s own mother's description of Dr. Hall's treatment consisting of medication management rather than therapy, Dr. Hall's treatment notes indicate he provided counseling to P.K. [Doc. 19, at 6.] Plaintiff provided a chart of Dr. Hall's progress notes from 2007-2010, with his "comments and findings."

It is uncontested that Dr. Hall provided some notations, usually minimal comments, on the progress notes.  But that would be consistent with a psychiatrist's need to assess what medications to prescribe or when to increase, decrease, or discontinue medications as he did.  The notes do not reflect that Dr. Hall provided traditional counseling sessions to P.K.  Indeed, that appears to be a reason why Dr. Hall referred P.K. and her mother to Hogares, i.e., for individual and family counseling.

The ALJ thoroughly and appropriately discussed Dr. Hall's progress notes, adjustment of medications, and reports of P.K.'s troubling behavior.   The ALJ also addressed Dr. Hall's

questionnaire in which he marked extreme and marked impairments. [AR 27.] The ALJ set out the

following rationale for assigning "diminished evidentiary value" to Dr. Hall's check-the-box ratings:

> Dr. Hall's opinion contrasts sharply with the other evidence of
> record, which renders it less persuasive and diminishes its evidentiary
> value.   According to [P.K.]'s mother, Dr. Hall only provides
> medication management and not therapy.   His opinion evidently
> relies heavily on subjective reports concerning areas outside of the
> scope of his observation.  Dr. Hall's opinion does not reconcile with
> the consistent reports of [P.K.] making good grades in school; or that
> she almost always completes her homework.  Dr. La Court found her
> attention and concentration as normal.  Her fourth grade teacher has
> reported that when [P.K.] is off her attention deficit medication she
> is unorganized and highly distracted.   When on medications, she
> handles her day's responsibilities very well.  P.K.'s fifth grade
> teacher observes no problems in acquiring and using information.
> She reported some problems focusing, working without distractions,
> and working at a reasonable pace and finishing on time, but has not
> more than slight problems in other areas in this functional domain.
> Considered in its totality, her deficiencies do not rise to a level that
> seriously interferes with her overall functioning in this area.  Her fifth
> grade teacher wrote that "[P.K.] does very well in the classroom," but
> is aggressive at play.  Testimony supports that she often fights with
> her siblings and is prone to anger outburst[s], but also has a new
> friend.  The evidence as a whole supports that [P.K.'s] behavior is her
> most significant problem.

[AR 28] (internal citations to record exhibits omitted).  The ALJ found a marked impairment in the

behavioral domain. [AR 30.]

    The Court concludes that the ALJ committed no error in assessing a marked impairment in

this domain, and that substantial evidence supports that opinion.  The ALJ properly diminished the

value or weight of Dr. Hall's check-the-box ratings.  The evidence of record, while variable at times,

simply does not support a conclusion of that P.K. suffered from the worst possible limitation in this

domain.

2.      ***Ability to Care for Herself***

The ALJ again set out the applicable regulatory language in assessing this domain, *e.g.,* this domain considers how well a child maintains a health emotional and physical state, including how well she satisfies her physical and emotional wants and needs in appropriate ways.  Assessment of the domain includes how the child copes with stress and environmental changes. [AR 31.] The ALJ further noted that the regulations provide that a school-age child without an impairment should be independent in most day-to-day activities (dressing and bathing), although she may still need some reminders.  The child should begin to recognize that she is competent in doing some activities but has difficulties in others.  She should be able to develop understanding of what is right and wrong, and what behavior is acceptable and unacceptable.  She should begin to demonstrate consistent control over her behavior and be able to avoid unsafe or unhealthy behaviors. [AR 31.]

Examples of limited functioning, although not necessarily indicative of marked or extreme limitations, include children who place non-nutritive or inedible objects in their mouths, use self-soothing activities that are developmentally regressive, do not dress or bathe age-appropriately, engage in self-injurious behavior (suicidal thoughts or actions, self-inflicted injury, or refusal to take medications), ignore safety rules, do not spontaneously pursue enjoyable activities, or have disturbances in eating or sleeping patterns. [AR 31-32.]

The ALJ observed that P.K sometimes needed prompting regarding bathing and brushing her teeth, but that she could perform such activities when told to do so.  Her third grade teacher identified some problems in this area, but her fourth grade teacher assessed no limitations beyond an observation of mood shifts.  The ALJ concluded that P.K.'s expressions of suicidal ideation are being addressed with therapy, and referred to the Hogares intake form. [AR 32.] The ALJ concluded that P.K. had a less-than-marked limitation in this domain.

41

Knight argues that P.K.'s suicidal ideation alone indicates an extreme impairment as it interferes very seriously with her ability to care for her health.  She asserts that the ALJ's error that P.K.'s assessment of a less-than-marked impairment in this domain is clear error because suicidal tendencies are always an impairment in this domain.  In support, Knight cites SSR 07-7p and Moore v. Barnhart, 366 F.3d 643, 652 (8th Cir. 2004).  Social Security Ruling 07-7p does not state that suicidal ideation alone indicates an extreme impairment in the domain of caring for oneself.  The ruling notes that a teenager with a depressive disorder who seeks emotional comfort by engaging in self-injurious behaviors like binge-eating, or suicidal gestures, is an example of an inappropriate emotional response in this domain.  Moore involved an adolescent who attempted suicide on multiple occasions, and is, therefore, distinguishable to the facts here where P.K. did not attempt suicide.

In addition, while acknowledging P.K.'s expressions of suicidal ideation, mostly as reported by Knight, the ALJ considered that P.K. was addressing those problems through therapy.  It is proper for the ALJ to consider whether medication or treatment can effectively reduce limitations. *See, e.g.,* 20 C.F.R. § 416.930(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work, or, if you are a child, if the treatment can reduce your functional limitations so that they are no longer marked and severe.").

Counsel then discusses the areas of bathing and hygiene, along with health and suicidal ideation.[19]  For example, Knight asserts that while school-aged children may need reminders to maintain adequate personal hygiene, an adolescent should not.  However, most of the pertinent time frame relates to P.K. when she was under 12 years old.

Knight observes that P.K.'s third grade teacher noted serious problems with her hygiene.  Indeed, this teacher rated P.K. has having serious problems in her ability to take care of personal hygiene and also, to care for her physical needs like eating and dressing.  However, the teacher did not rate those problems as severely as she could have, *i.e.,* as presenting "very serious problems."  In addition, the teacher rated  P.K. as having obvious problems in 5 of the 10 subcategories of this domain and has having slight problems in 3 subcategories.  She did not indicate "no problem" for any of the subcategories.  The teacher wrote that P.K.'s mother made sure her daughter took medications and that P.K. often came to school looking clean but with an odor problem "(smelling sick)." [AR 185.]

Plaintiff further asserts that at the 2010 ALJ hearing in June 2010 (when P.K. had turned 12 two months earlier), Knight testified that she still had to remind P.K. to brush her hair, brush her teeth, and take medications.  P.K. testified that she needed daily reminders.  Knight argues this was additional error by the ALJ because he failed to discuss the hearing testimony. [Doc. 19, at 9-10.]

---

[19]SSR 09-07p notes that the domain of "caring for yourself" does not address a child's <u>physical</u> abilities to perform self-care tasks like bathing, getting dressed, or cleaning up his/her room.  Those physical abilities are addressed in the domain of "moving about and manipulating objections," and where appropriate, in the domain of "health and well-being."  As noted *supra*, virtually no provider found impairments for P.K. in the domain of moving about and manipulating objections.  Even Dr. Hall found impairments of "none to slight" in this domain. [AR 362.] However, it is true that children and adolescents perform most daily activities like dressing and bathing independently, although it is appropriate for children ages 6-12 to receive some reminders.  SSR 09-07p, at *5-6.

Knight also contends that the ALJ was required to consider how well P.K. took care of her own health.  For example, a school-aged child should be able to recognize when she felt ill and request medical attention.  Her 3rd grade teacher commented that P.K. would not ask to go the nurse's office when she was sick and did not tell her teacher when she felt sick. [AR 185.]

Knight relies on her own reports in December 2007 that P.K., at age 9, talked about not wanting to be around.  Dr. Hall's medical record notations showed P.K.'s tendency to harm herself, although again those notations appear to reflect the mother's reports.

Knight discusses the Hogares evaluation in March 2010, and the mother's reports about her daughter's violent behavior and her talk about killing herself.  Knight argues that P.K. reported to the Hogares provider that she had suicidal ideation at least once a week, had trouble falling and staying asleep, and had difficulty keeping friends.  Knight reported that P.K. could be rude and hurt the feelings of others.  P.K. often felt like nothing would change or improve, and that it was not worth getting out of bed.  She felt depressed daily. [AR 370-73.]

Knight discussed the individual/family therapy records from Hogares that were before the Appeals Council.  A number of records are summarized, including Knight's report that they were kicked out of their house because of P.K.'s damage to the house, and the therapists' observations that P.K. attempted to answer questions the way the therapist wanted, that P.K. was unrealistic in her perceptions about her life situation, the family's contradictory information about where they were living and the childrens' attempts to protect their mother.  Therapists indicated that P.K. had poor judgment and that her drawings were interpreted to indicate anger and bi-polar depression.

Knight further argues that the ALJ improperly minimized the impact of the Hogares records and committed error when he determined that the Hogares diagnoses did not originate from an "acceptable medical source" under the regulations.  Knight agrees that the counselor who completed

the Hogares intake form is not an "acceptable medical source" for purpose of a diagnosis, but claims that the report is entitled to significant weight as to P.K.'s limitations and symptoms.  Moreover, Knight asserts that Dr. Hall already diagnosed P.K. with Bipolar Disorder II.  Knight contends that the Hogares staff opinions about the severity and limitations from already diagnosed impairments may be given more weight than non-examining state agency opinions. [Doc. 19, at 14.]

Finally, Knight relies on Dr. Hall's March 2010 rating of this domain as marked.  She further argues that the ALJ's rating in this domain is "overwhelmed by evidence to the contrary." [Doc. 19, at 15.] The ALJ's written decision, while perhaps not discussing each of the records relied upon by Knight in detail, indicates the ALJ considered all of the evidence.  Indeed, the ALJ specifically considered the 3rd and 4th grade teachers' questionnaires and the Hogares intake form in reaching his findings. [AR 32.]   The ALJ reviewed the examining and non-examining physicians' reports. [AR 27.]  He discussed Dr. Hall's records and fully explained the diminished weight given to Dr. Hall's opinions. [AR 27, 28.]

As noted above, in 2007, Dr. Bloedel's medical notations in March were that P.K. had trouble remembering to take her medications and often forgot them, but in April, P.K. "rarely forgot her medications," and her medications helped. [AR 257, 260.] In May 2007, a medical record indicates P.K. rarely forgot her medications and that she did well as long as she took the medications.  Her mood and ADHD were noted as stable with the present medications.  The doctor wondered if P.K.'s moodiness was caused by early pubertal changes. [AR 254.] The teacher questionnaire from this time period was discussed above. [AR 184-86.]

In July 2007, Dr. LaCourt observed P.K.'s affect as appropriate.  He noted Knight's report that P.K. wrote a "self-harm" note while at a doctor's appointment recently and that the note "came out of the blue."  Other than write the note, P.K. had not done anything to harm herself, had no

adverse plans, actions or injuries.  She did not acknowledge making herself ill before coming to

school, and Dr. LaCourt found a possibility that P.K.'s stomach upset might be associated with

taking medications on an empty stomach.    [AR 279.]

Dr. Blacharsh's evaluation of the records in August 2007, included comments that P.K. did

not report being sick to her teacher and did not request to go to the nurse's office when ill.  The

function report filled out previously by Knight indicated no problems in this domain. [AR 285.]

In a November 2007 report, Knight reported that it was difficult to get P.K. to go to school,

that she was a very "hard" child, and that P.K. had a teacher helping her with a behavior program.

[AR 195.] There are no school records indicating a behavior program was in place.

In November 2007, Dr. Hall first started seeing P.K.  He noted diagnoses of ADHD and BPD

(bipolar disorder presumably), but it is unknown if he diagnosed these conditions, or if they were

previous diagnoses that Knight relayed to him.  There is no indication of testing during this first

appointment.  However, Dr. Hall wrote down a series of words and phrases, *e.g.,* mood swings, acts

out, tempers, fits, screams, hits holes in house, hard to fall asleep, loses temper, argues, worrier,

sleeps on floor, has hit a child in face, behavior plan, scared of dark, headaches, quiet, shy, etc. [AR

311.] It appears that he was writing down what Knight reported to him about P.K. [AR 311.] Dr.

Hall noted, for example, that the mother was a poor historian.  Dr. Hall appeared to also note on this

date that P.K. was not suicidal. [AR 312.] There is no record evidence that P.K. ever attempted

suicide.

In a function report for P.K. in December 2007, Knight wrote that she was not certain if

P.K.'s impairments affected P.K.'s ability to care for herself.  However, according to Knight, P.K.

did not eat, had to have her mother get her bath ready, would not wash her own hair, and did not

brush her teeth all the time.  P.K.'s mother had to remind her to do those things.  P.K. had a difficult

46

time selecting clothes to wear, and as reported by Knight, talked about "not being around." [AR 206-09.]

A teacher's questionnaire in December 2007 indicated that she observed a "surprising shift" of mood in P.K. over short periods, on a weekly basis.  P.K. was happy one moment and then sullen and silent after 15 or 20 minutes. [AR 216.] However, this teacher provided no ratings in the domain for caring for herself.

The 2008 records are similar to 2007 records, although fewer in number.  In some appointments, P.K. was reported to have thrown a fit [AR 334.], and on another date, it was reported P.K. was "doing good in school." [AR 304.] As of April 2008, Knight reported that she still combed P.K.'s hair and had to be reminded to bathe. [AR 222-25.] In April 2008, Dr. Hall noted P.K.'s sleep was good, as were her grades.  She was stable, but noncompliant with medications.  She was hyperactive and impulsive.  It appears that Dr. Hall believed therapy would be of assistance to P.K. and her family.  He prescribed an anti-depressant. [AR 304, 330.]

The 2009 records are variable as well.  In January, Dr. Hall wrote P.K. was doing well with ADD symptoms, but that her grades went down if off her medications. [AR 298.] In March 2009, P.K. had excess appetite, problems going to sleep and remaining asleep, irritability, and anger issues.  She had been harming herself and making marks, perhaps on herself.  There is a notation about choking herself. [AR 297.] It is unclear if these are reports by Knight or P.K., but the reports appear to have been made by P.K.'s mother.

In August 2009, Knight reported that P.K. had told her brother she was going to kill him with a knife and that P.K. had been "hurting them" and yelling at them. [AR 292.]

P.K.'s fifth grade teacher filled out a questionnaire in September 2009, and addressed the six domains.  With respect to caring for herself, the teacher noted that P.K. wore a hearing aid and

took good care to wear it every day.  The teacher did not know about P.K.'s medications. [AR 236.]
As part of the forms the teacher filled out, there does not appear to be a checklist specifically for this
domain.

In 2010, Knight complained to Dr. Hall on several occasions about problems P.K. was
having – problems with sleep, irritability, anger, and unhappiness.  Knight described P.K. as acting
like a 2 year old who did not want to get ready for school.  According to Knight apparently, when
P.K. "bites, [she] draws blood." [AR 314, 315, 317.]

On Dr. Hall's March 2010 checklist for this domain, he found a "marked" impairment.

The Hogares counselor met with P.K. and Knight in late March 2010, and took down
information and history, as provided by the family. [AR 365.] Knight reported notes and threats by
P.K. to kill herself and that she scratched out her face in pictures.  Knight had to remind P.K. to
bathe and change her clothes.  P.K. threw fits like a 2 year old.  Knight stated that P.K. tried to run
away several times and often felt nothing would improve or was worth getting out of bed.  P.K.
expressed suicidal ideation in the past and felt depressed for the past two years.  It was reported that
P.K. thought about killing herself once a week but had no plan.  She had choked herself before  She
had abrupt, extreme mood swings. [AR 372, 373.] She had homicidal ideation too.  The interviewer
observed that this historical data was inconsistent.

The Hogares interviewer believed that the family's unrelenting crisis situation, P.K.'s family
history, and a genetic link to substance abuse or mental illness, environmental influences, and
domestic violence all affected P.K. negatively and increased her depression. [AR 374, 375.]

The subsequent Hogares family and individual therapy notes are not extensive and appear
primarily to reflect the family's crisis situation in terms of being homeless at points, Knight losing
her job, and the children attempting to protect their mother.

48

P.K. admitted to the counselor that she sometimes forgot to feed the dogs and cats, but claimed she did help with kitchen work and cleaned the living room. She was supposed to clean her room but did not. [AR 367.]

While there is some evidence to support an impairment in this domain, the Court's role is not to re-weigh the evidence or to substitute its own judgment for that of the ALJ/fact finder, even in difficult cases like this. Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991). The ALJ properly set forth substantial evidence to support his findings and committed no legal error in his analysis. The Court determines that the ALJ's findings in this domain are "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See* Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). Moreover, the Court does not find that the possible evidence supporting a more severe limitation in this domain is "overwhelmed by other evidence in the record." *See* Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks omitted).

### 3. *Acquiring and Using Information*

Knight argues that the ALJ's less-than-marked limitation in this domain was erroneous or not supported by substantial evidence. According to Knight, P.K.'s impairment in this domain is "at least marked." [Doc. 19, at 15.]

The ALJ acknowledged that P.K. was deficient in reading skills, but overall was advancing academically in an age appropriate manner. [AR 29.] Knight contends that the ALJ's lone sentence at the end of his analysis regarding this domain is incomplete and unsupported by substantial evidence.

However, as discussed fully above, the ALJ's analysis of the domains should not be isolated from his analysis of the records preceding the discussion of the specific six domains. The ALJ

49

considered all of the evidence, including teacher questionnaires, medical records, evaluations by consulting and non-examining physicians, and Dr. Hall's records and opinions. [AR 27, 28.]

The Court concludes that the ALJ committed no legal error and that his finding with respect to this domain was supported by substantial evidence. Indeed, the record is clear that P.K. was never held back in school and proceeded at grade level in virtually all subjects, with the exception of reading. While Knight contends that the ALJ's review of evidence was myopic in this domain, Knight consistently highlights portions of records that are favorable to her position and ignores significant parts of records that support the ALJ's findings.

### 4.   *Attending and Completing Tasks*

Knight argues that the ALJ's less-than-marked limitation in this domain was erroneous or not supported by substantial evidence. She contends that there was ample evidence from P.K.'s teachers and her mother that this was an area of "great concern." According to Knight, the ALJ should have found at least a "marked" impairment in P.K.'s ability to attend to and complete tasks. [Doc. 19, at 18-21.]

The ALJ reviewed the pertinent regulations and definitions for the domain. He concluded that although P.K. continued to have some problems in this domains, she made "good grades and usually complete[d] her assignments. She is able to follow directions and organize her responsibilities at school when she is taking her medications." [AR 29.]

Knight again isolates portions of records that conflict, at least in part, with the ALJ's conclusions. For example, she emphasizes the 4th grade teacher's report that P.K. had a serious problem working at a reasonable pace and finishing her work on time. She also highlighted portions of the consulting physician's evaluation of P.K., and discussed parts of the 5th grade teacher's ratings of the domains.

50

In 2008, Dr. Hall indicated in medical records that P.K.'s grades were good and that teacher feedback in school was "ok." [AR 307, 300, 304.] P.K. was monitored closely by Dr. Hall in 2008, but there are no other records provided in 2008 that discuss school performance this year or P.K.'s ability to perform and complete tasks.

The only record in 2009 that specifically addresses this domain is the 5th grade teacher's questionnaire. In this domain, the teacher rated P.K. as having a serious problem in one subcategory (working at reasonable pace/finishing on time) out of 13 subcategories. She rated P.K. as having either no or slight problems 10 of 13 subcategories, with obvious problems in two of those subcategories. This is not "overwhelming evidence" of a marked or severe limitation.

The 2010 records consist mostly of Dr. Hall's records and the Hogares' therapy records. The ALJ properly discounted Dr. Hall's opinion. The Hogares' individual and family therapy records, at least to the extent specific documentation is provided by the counselors, address family and relational issues rather than P.K.'s ability to complete tasks.

The Court finds no error by the ALJ and that the ALJ's findings were supported by substantial evidence in this domain.

5.     *Health and Physical Well-being*

Knight argues that the ALJ's less-than-marked impairment in this domain was erroneous or not supported by substantial evidence. She focuses on P.K.'s hearing impairment and relies primarily on Dr. Hall's check-box rating in March 2010. [Doc. 19, at 21-23.] She argues that the cumulative effects of physical and mental impairments supported a marked limitation.

The ALJ observed that the assessment in this domain included the cumulative effects of physical and mental impairments, along with treatments or therapies P.K. received. [AR 32.] For example, the ALJ recognized that P.K. was under significant family stress related to the family's

51

recent eviction from their home and Knight's loss of her job. The ALJ noted that P.K. wore her hearing aid regularly and that the evidence showed she did not frequently miss school due to illness. She received both medication management and behavioral therapy, but did not have significant somatic complaints related to her impairments or limitations in physical functioning due to therapy, treatment, or a need for intensive medical care. [AR 32.]

As stated previously, the ALJ appropriately considers what treatment a claimant may receive and the efficacy of that treatment. An impairment that can be remedied or controlled with treatment does not support a claim for social security benefits. *See* Dixon v. Heckler, 811 F.2d 506, 508 (10th Cir. 1987) (impairment not disabling when medications or treatment adequately control it without significant side effects). The evidence of record indicated that P.K.'s hearing aids improved her classroom performance. Moreover, teachers consistently stated they understood P.K.

The Court concludes that the ALJ committed no error and that his findings with respect to this domain are supported by substantial evidence.

C.     Analysis of Other Alleged Errors

1.     ***Comparison of P.K. to Non-Disabled Children***

In addition to alleging errors in the ALJ's domain findings, Knight contends that the ALJ erroneously failed to compare P.K. to non-disabled children. In support, she cites 20 C.F.R. § 416.913(c)(3) and SSR 09-2p. [Doc. 19, at 23, 24.] Subparagraph (c)(3) provides that the ALJ can consider the medical source's opinion about a child's functional limitations "compared to children your age who do not have impairments in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for yourself, and health and physical well-being." 20 C.F.R. § 416.913(c)(3). SSR 09-2p similarly provides that the analysis includes evaluation of the child's impairment(s) with respect to how they

affect day-to-day functioning and whether the child's activities are typical of other children of the same age who do not have impairments.

In the ALJ's written decision, he expressly stated that he "must compare how appropriately, effectively and independently the claimant performs activities compared to the performance of other children of the same age who do not have impairments." [AR 24.] Knight contends that the ALJ's discussion of P.K.'s preferential classroom seating is evidence that he compared to her to children with impairments.  Similarly, Knight argues that the ALJ's approach of discussing Knight's treatment with  therapy was error.  "The evidence from teachers, medical doctors, psychiatric professionals, and clinical experts reveals that preferential seating, specialized attention and support, medications, counseling, and hearing aids all are necessary for P.K. to function in the classroom." [Doc. 19, at 24.] Thus, according to Knight, the ALJ's analysis was flawed.

The Court disagrees and finds the argument unpersuasive.  The ALJ noted the proper analysis and followed it in assessing the domain impairments.  The ALJ appropriately discussed P.K.'s treatment along with how it affected her performance in the classroom.  The fact that he discussed her treatment does not mean he failed to compare her to children without limitations or disabilities.  The Court concludes that substantial evidence supports the ALJ's findings and that reversal is not required on the basis asserted by Knight.

### 2.    *Consideration of Mother's Testimony*

Knight asserts that the ALJ failed to consider P.K.'s mother's testimony and that he only "generically" referred to hearing testimony regarding school problems, anger and violent outbursts, and fighting." [Doc. 19, at 24.] At the hearing, the ALJ listened to testimony by Knight and by P.K. [AR 51, 65.] The ALJ made specific credibility findings to the extent he concluded that statements concerning the intensity, persistence and limiting effects of P.K.'s symptoms "are credible" provided

"they are consistent with [the] finding that [P.K.] does not have an impairment or combination of impairments that functionally equals the listings. . . ." [AR 27.] The ALJ then explained his reasons for the findings through discussion of the records.  The ALJ did all the law requires.  He further noted that Knight testified at the hearing that P.K. attended therapy weekly.  The ALJ also discussed testimony about P.K.'s fighting with her siblings, tendency to anger outbursts, and that she has a new friend.  This testimony was provided by both Knight and P.K. at the hearing. [AR 28.]

The Court finds no error by the ALJ and that substantial evidence supports his findings and conclusions.

3.     ***Consideration of Combination of P.K.'s Impairments***

Knight argues that the ALJ did not examine everything P.K. did at home, at school, and in her community, contrary to SSR 09-1p, and that the ALJ failed to consider P.K. as a "whole child." [Doc. 19, at 25.] The Court disagrees and finds that the written decision of the ALJ expressly demonstrates that he considered P.K.'s combination of impairments, including her hearing loss, reading disorder, and ADHD. [AR 26.] Moreover, the ALJ discussed P.K.'s fighting at home, angry outbursts (that occurred in various locations according to Knight), and her friend in the neighborhood.  He examined the teacher questionnaires concerning P.K.'s school performance. There is no evidence demonstrating the ALJ failed to consider P.K. as a whole child or failed to consider her combination of impairments.

The Court recognizes that P.K. has been raised in a difficult and troubling environment, and that no child in America deserves the misfortune, uncertainty, and dysfunction with which she has had to contend.  However, the Court's function is not to substitute its judgment for that of the ALJ, but rather, to determine if substantial evidence supports the decision.  In this case, it does.

Therefore, the Court finds that the ALJ committed no error and that substantial evidence supports his findings and conclusions.

## VI.   **<u>RECOMMENDATION</u>**

For the reasons explained above, the Court recommends that Knight's motion for reversal or remand be DENIED and that this matter be DISMISSED, with prejudice.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge